UNITED STATES of America,
Plaintiff,

v.

Robert A. COUGHLIN et al.,
Defendants.

UNITED STATES of America,
Plaintiff,

v.

Paul V. McELWAIN et al.,
Defendants.

Civ. Nos. 74–634, 74–656.

United States District Court,
D. Oregon.

Dec. 11, 1975.

Joseph E. Buley, Portland, Ore., for plaintiff.

Sydney L. Chandler, Coos Bay, Ore., for defendants Coughlin.

John T. Foss, Coos Bay, Ore., for defendants McElwain.

BURNS, District Judge:

## I. THE ROGUE RIVER:

The Rogue River is one of the nation's wonders. Its waters wash the shores of the two parcels of property in these cases upon which the government has imposed "scenic easements." As a result of the easements, the value of defendants' properties has been diminished. The amounts of the value of such taking are at issue in these cases.

The Rogue dashes and dances, meanders and marches, and tosses and tumbles its way nearly 200 miles from its headwaters high in the Cascades to its mouth at the sea at Gold Beach. About 84 of these miles in the lower section of the Rogue are officially classified as wild, scenic or recreational, categories established by and pursuant to the statutory framework of the Wild and Scenic Rivers Act of 1968.[1] The Lower Rogue, where defendants' properties are located, is characterized by the blunt beauty of sheer granite walls as well as slopes which range from gradual to steep, carpeted with firs, pines, cedars along with madrona, tan oak and other colorful hardwood varieties. Sand and gravel bars mark various portions of the shores of the Rogue. Some of these shift constantly under the pressure of the wild rush of the river's waters.

Wildlife abounds. Dainty blacktail deer bounce up and down the bordering slopes of the Rogue. The black bear may occasionally be seen, as well as smaller mammals such as foxes, squirrels, raccoons and others. The bird life of the region is particularly striking. High above the water, the Osprey wheels and whirls, alternately patrolling the area near its nests atop snags of trees, and scanning the stream for salmon and steelhead far below. Groups of buzzards huddle near the shores; when they take wing, they circle ceaselessly in their search for carrion, portraying a picture of breathless balance in flight in sharp contrast with their tiny red heads and great foreboding bodies of black. The Great Blue Heron stands like a sentinel at the water's edge concentrating intently on its search for fish in the clear shallow waters near the sand bars. Occasionally the herons set off in graceful soaring flight up and down the river.

The Rogue is peppered with pungent place names—Wakeup Rilea Creek, Windy Creek Chute and Maggie's Riffle, to name just a few—redolent of a rough and ready history.

It is in this context that defendants' properties exist. Hence it is the context in which the property values (and diminution thereof by virtue of the government's easement) must be studied.

## II. NATURE OF EASEMENTS TAKEN:

These two cases, Civil No. 74–634 involving a 53-acre parcel owned by Coughlin and Lyons (hereinafter Coughlin), and Civil No. 74–658 involving a 29-acre parcel owned by the McElwains, were tried in Gold Beach in a non-jury trial.[2] The central issue involved in each is the diminution in property value resulting from the imposition of the easements authorized by the Act and by its implementing regulations. Each of these

---

1. 16 U.S.C. § 1271 et seq. (1974). The particular plans for the Rogue River easement were published in 35 Fed.Reg. 17300–17309 (1969) and 37 Fed.Reg. 13408–13416 (1972).

2. I had the benefit of a view before trial, involving inspection of the properties from the river via jet boat, and personal inspection thereafter during an automobile trip to each.

This will partly account for the purple judicial prose with which this opinion commences. My main purpose with the purple prologue, however, was to set out the superb scenic context in which the properties are located, since their value reflects their setting.

properties is in the area denominated recreational. The exact nature of the easement taken is set forth as an appendix to this opinion.

The most important aspect of the easement involves a limitation on the number of homesites which may be developed after imposition of the easement. In Coughlin's case, the easement permits only eight residential homesites, meaning that Coughlin may own or develop only seven more, one homesite existing at the time of the taking. In McElwains' case, the easement permits three homesites—two more in addition to the existing homesite. The easement further provides that any permitted development must be in accordance with the terms of the easement and must be so constructed and situated as not to be "obtrusive to the river user." Another component of the easement permits the public to use 10 feet along the shoreline for members of the public to walk on and fish from. Also included are restrictions on tree cutting and other activities which would detract from the wild and scenic nature of the vista. Since the appraisers were in agreement that the highest and best use of each parcel was for development of recreational homesites, the central focus of these cases is the homesite limitation aspect of the taking.

## III. JUST COMPENSATION:

■ Since just compensation is to be determined by the traditional concept of the difference between fair market value before and after the taking, we resort to a traditional definition. This involves consideration of what a buyer would pay to a seller both immediately before and immediately after the taking where each was knowledgeable as to the highest and best use of the property and where each was willing but not obliged to buy or sell. *United States v. 100 Acres of Land, More or Less, in Marin County, State of California,* 468 F.2d 1261 (1972), *cert. denied* 414 U.S. 864, 94 S.Ct. 37, 38 L.Ed. 2d 84 (1973); 4 Nichols on Eminent Domain § 12.2(1) (1975). Various

methodologies were used or discussed by the appraisers and landowners, including valuation on a per-homesite basis; on a per-acre basis; and on a per-front-footage basis. All valuations of property ultimately come down to an informed judgment, regardless of the unit on which the appraisal is based. Selection of a particular unit as an appraisal basis will have a powerful influence upon the end result—the informed judgment of value which the appraiser makes. Sincere, honest appraisers who use different units as the basis for their appraisals may well end up with rather widely divergent values. In this sense, selection of the unit as the basis for the appraisal, like beauty, tends to be in the eye of the beholder or appraiser. So also, to a lesser extent, does value.

After the completion of a given transaction, one which meets the classic definition of an arms-length, open-market, fair-value transaction, the buyer may well look back and say, "I paid X dollars per acre." The seller may look back and say, "I sold my property for Y dollars per homesite." The appraiser, upon scrutiny, may say, "That property went for .Z dollars per front foot." All are talking about the *same* transaction. Fair market value in these cases necessarily depends greatly upon study, usage or rejection, and adjustment of "comparable" sales. Comparability is much the same as value and beauty. Here, all appraisers noted the difficulty of selecting transactions which were comparable to the "after" value of the subject properties. There were virtually no post-easement transactions, hence there was no settled market history to which to resort.

■ In these cases, the government appraiser tended to use the per-acre methodology. The landowners used a homesite methodology, while their appraisers used a per-acre unit value developed largely from "comparables" of a homesite size and considering the possible homesites the property could develop. Ultimately the fact finder in such

a case must make the best judgment possible based upon a preponderance of the evidence and upon that expert opinion which seems the most persuasive in light of the comparable sales and the other bases asserted for the opinion.

## IV. COUGHLIN:

In Coughlin's case, as mentioned above, the parcel includes approximately 53 acres, with about 4,200 feet of river frontage. The government's appraiser was of the opinion that diminution in value was minimal. He did not believe that the parcel would support more than the eight homesites permitted by the easement. Indeed, some of the government's evidence tended to show that perhaps only a maximum of five homesites would be permitted under applicable sanitary regulations. The government appraiser, using essentially a per-acre methodology, gave his opinion that both the before and after value on the property was approximately $1,500 an acre, or a total of $80,000. He assigned a figure of $5,000 as the total diminution in value without any particular analysis of how this figure was derived.

Coughlin's appraiser, on the other hand, said the value of the land before the taking was $174,300 and $108,065 after the taking. He assigned a diminution value to the taking of approximately 38%, again without any particular analysis based on objective criteria. Coughlin's evidence tended to show that a greater number of homesites than the eight now permitted were, in fact, feasible. The owners, for example, said their plans called for development of seventeen separate homesites. In their opinion, each would be worth $13,000 or a total of $221,000; in their opinion, they suffered 50% loss or about $110,000. The sanitary expert who testified on behalf of the landowners expressed his opinion that there were 21 possible homesites. In my opinion, both sides missed the mark as to maximum potential number of homesites. One portion

of the parcel is too steep for septic systems, and a considerable portion of the property, including the "bench" area, is subject to flooding. Flooding, in this sense, refers to the 1964 flood, the so-called "100 year" flood, and the greatest in the memory of residents of the area. Even so, some dwellings have been rebuilt, since 1964, below the 1964 floodline. However, a knowledgeable buyer, in considering what price to offer, would normally think only of homesite development above the 1964 line.[3] A preponderance of the evidence justifies a conclusion that 11 homesites would be the maximum number that a willing and knowledgeable buyer would conclude could be developed feasibly if he were purchasing the property on the day before the taking. A buyer who bought on the day after the taking, would be influenced by the fact that development of the permitted homesites would be subject to and restricted by the imprecise language of the easement. Such a buyer would realize that homesite development would have to be not "obtrusive to river users," *as determined* by governmental authorities. With no history of settled administrative practice upon which to rely, and recognizing that obtrusivity, like beauty, tends to be in the eye of the beholder from the bureau involved in approving the development, such a buyer would condition his offer accordingly. Such an offer would be on the lower rather than the higher side of the value of each permitted but undeveloped homesite.

In arriving at a conclusion as to the diminution in value of Coughlin's parcel, I base my consideration upon all the evidence, including the opinions of the experts, and close study of the comparable sales they used, all as aided by my view of the premises. The three unpermitted homesites represent a value of $9,000 each. The remaining seven homesites now permitted in addition to the existing homesite would each pro-

3. Sec. 10 of the restrictions imposed by the easement requires written permission from the government. P. 5, Appendix.

duce $1,000 less per homesite in the mind of the hypothetical buyer the day after the easement was imposed. In addition, a lump sum of $4,000 is awarded based upon the deprivation of privacy which will be produced by public usage of the 10 feet along the shore and by the necessity for the owner to comply with the other prohibitions contained in the easement. The existing homesite is not diminished in value at all, save and except that it, along with the rest of the parcel, shares in the diminution due to the shoreline public access and the other items just mentioned. In summary, I conclude that the value of the interest taken is $38,000 which includes the total of $27,000 for lost homesites, $7,000 for diminution of value of seven permitted new homesites, and $4,000 for the other aspects mentioned.

## V.  McELWAINS:

As to McElwains' 29 acre parcel, with 3,550 feet of frontage, the government appraiser gave as his opinion of loss the amount of $26,100. He used, as he had on Coughlin, the per-acre methodology. He concluded that the diminution in value reduced the property from $1,700 per acre before the easement to $800 per acre after the easement. Mr. McElwain said it was his plan to develop 20 sites for mobile homes. He assigned a value of $10,000 per mobile homesite, or a total of $200,000. In his judgment his loss was 75% of that amount, or $150,000. As is not unexpected, a landowner's own estimate generally tends to be less than perfectly objective. The testimony as to the number of feasible homesites was mixed. The landowners' appraiser, while not specifying any given number, noted that the previous zoning did authorize one homesite per acre, though the topography and configuration was such that no one could seriously contend that there were 29 homesites available. The government's appraiser thought that five or six would be the maximum number of homesites. ▆▆  My own conclusion, based upon the factors previously mentioned, is

that the property would accommodate seven homesites. Hence, the effect of the taking is to deprive the McElwains of four homesites which could otherwise have been developed. The added value of these extra homesites would have affected the price a buyer would offer before the taking. *United States v. 100 Acres of Land, supra.* The particular location of the McElwains' property persuades me that these homesites would have been more valuable than those of Coughlin and consequently their loss per homesite is the figure of $11,000. Further, I conclude that the two remaining permitted homesites would each produce $1,000 less, for the reasons discussed in Coughlin's case. In addition, a lump sum of $2,500 is awarded for public shoreline usage and other easement factors. Except for its share in these latter aspects, the existing homesite is unaffected. In summary, the value awarded includes $44,000 for lost homesites, $2,000 for decline in value of the two remaining homesites, and $2,500 for the other aspects mentioned, or a total of $48,500.

## VI.  TIMBER VALUES:

▆  McElwains' case involved no loss of merchantable timber, but there was a sizeable amount of merchantable timber on Coughlin's property. This is deemed taken in its entirety by virtue of the easement's ban on tree cutting. Thus a discussion of the value of Coughlin's timber is necessary.

▆  There was a sharp contradiction in the appraisers' estimates of the amount of merchantable timber. The preponderance of the evidence favors the estimates by the landowners' timber expert. While both experts testified to their extensive experience in timber cruising, the Forest Service's methodology is clearly less preferable. Coughlin's expert's estimate was based on a 100% cruise. The government's estimate of volume of merchantable timber was based upon a 1968 cruise revised upward by making "increment borings" on a limited number of trees shortly be-

fore trial. This technique has significant infirmities when the fact finder is called upon to choose between experts who differ by as much as 15% in the timber volume involved. Consequently, I adopt the volume estimated by the landowners' expert. The volume of merchantable timber taken is a total of 761,-000 board feet consisting of 722,000 board feet of conifers (firs and cedars) and 39,000 board feet of culls.

The government expert gave his opinion as to the value of timber in place as of the date of the taking, as did Walker, the expert hired by the landowners. The landowners, in addition, who are in the timber business, furnished their own estimates. The landowners' expert was more persuasive than that of the government. My findings are based in large part on Walker's opinion. I do not, however, adopt his valuation in its entirety. His value was $225 per thousand board feet for Douglas fir, whereas that of the government expert was $140 per thousand board feet. I adopt a figure of $190 per thousand (or a total of $137,-180 for merchantable conifers) based upon my evaluation of Walker's testimony and allowing $60 per thousand for cost of removal and profit. The price paid to the landowners would reflect that price which the purchaser could sell it for at the nearest mill or market on the coast, minus expenses of cutting and removal and a suitable profit factor. It is unnecessary to make a lengthy recital of the mathematics employed by the various witnesses. The figures are known to the parties, there is no dispute as to the particular mathematics involved, and such a recital would unnecessarily prolong the length of this opinion.

VII. SUMMARY:

In summary, the Coughlin taking involves $137,180 for timber and $38,000 for land, or an overall total of $175,180. The McElwains taking involves $48,500 for land.

The foregoing constitutes findings of fact and conclusions of law, all pursuant to Rule 52, F.R.Civ.P.

## APPENDIX

### Estate to be Acquired

The estate hereby taken for public use is an easement and right in perpetuity to administer land to protect the scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values of the free-flowing Rogue River and its immediate environment, and to prevent any developments or changes that will tend to detract from the scenic and recreational value of this area, and to that end exercise such reasonable controls over the lands and make use of the land described herein as may be necessary to accomplish such objectives. The rights taken and restrictions imposed are as follows:

RIGHTS OF USE BY THE UNITED STATES

The United States shall have the right to go upon the land described herein for the following purposes:

1. To inspect for violations of this easement.

2. To clean up any trash, debris, garbage or other unsightly or offensive material which may be found on the area described herein.

3. To mark, prune, cut, remove, or otherwise dispose of all dead, dying, diseased, insect-infested, live, or other trees and shrubs which in the judgment of the United States, endanger the public safety, detract from the aesthetics of the herein described area, or are necessary to provide for the construction of improvements as otherwise authorized herein. The landowner shall be consulted prior to initiation of such operations. Any merchantable timber so cut shall, unless otherwise agreed, be

cut into logs of standard lengths for disposal by the landowner.

4. To selectively cut or prune brush.

5. To implement erosion prevention measures.

6. To implement disease prevention measures to protect the scenic quality of the river setting.

7. To plant trees or perform restoration work as deemed necessary to protect, restore or enhance the scenic view.

8. To protect and restore historical or archeological sites which may exist within the easement area.

9. To take all measures deemed necessary to prevent or suppress forest fires.

Nothing herein shall be construed as creating any duty on the part of the United States to undertake any of the acts described.

## RESTRICTIONS ON LAND USE BY SERVIENT LANDOWNER

The following restrictions are imposed upon the land described herein:

1. Not more than 3 * single-family dwellings with normal appurtenant structures shall be permitted on the easement area.

   Buildings and structures shall have an attractive appearance, earth-tone color, nonreflective finish or material, and a height no greater than (30) feet on the river side.

   Provisions shall be made for sufficient topographic or vegetative screening to prevent such structures from being obtrusive to river users.

   Adequate provisions for disposal of waste and sewage shall be made to fully comply with applicable State and local regulations for sanitation and water pollution control.

The construction, placement, or exterior alteration of any structure may be undertaken only after obtaining prior written approval of architectural and site plans from the Secretary of Agriculture or his duly authorized representative.

There is specifically retained by the landowner, the right to perform ordinary maintenance on all existing buildings and structures, together with the right to replace, rebuild, or substitute any building or structure now existing with a similar building or structure in substantially the same location, provided, however, that the replacement, rebuilding, or substitution of any building or structure may be undertaken only after obtaining prior written approval of architectural and site plans from the Secretary of Agriculture or his duly authorized representative.

Except as provided herein, no other new structure of any kind shall be placed on, or erected upon the easement area.

2. Existing buildings and structures not presently used for commercial or multiple-family purposes shall not be converted to such use without prior written authority from the Secretary of Agriculture or his duly authorized representative.

3. No new installation of utility structures or lines shall be made upon or within the easement area without prior written approval of the Secretary of Agriculture or his duly authorized representative.

4. No changes in the general topography or land surface (including excavation, road construction, and the quarrying or removal of rock, sand, dirt, gravel, or other

* 8 in the case of Coughlin.

**20**

material) will be permitted within the easement area without prior written approval of the Secretary of Agriculture or his duly authorized representative.

5. There is specifically retained by the landowner, his heirs, successors and assigns, the right to perform ordinary maintenance on all roads on the easement area. The replacement, rebuilding, or substitution of any such road with a similar road must have prior written approval of the Secretary of Agriculture or his duly authorized representative.

6. No dump of trash, debris, garbage, or other unsightly or offensive material shall be placed or maintained upon the easement area.

7. No signs, billboards, outdoor advertising structures, or advertising of any kind or nature shall be located on the easement area without prior written approval of the Secretary of Agriculture or his duly authorized representative.

8. No salmon boards, docks, or other structures which will extend into the river are allowed.

9. No trees or shrubs shall be cut, pruned, removed, or destroyed within the easement area except those authorized in writing by the Secretary of Agriculture or his duly authorized representative, provided, however, seedling trees or seedling shrubbery may be grubbed out or cut down in accordance with good farm practice on lands presently being cultivated or for residential maintenance purposes. Cultivated crops, including orchard fruit and nut trees, may be pruned, sprayed, harvested and otherwise maintained in accordance with good farm practice.

10. Except as otherwise provided herein, no new structure shall be placed below the high water line of December 1964 without written approval by the Secretary of Agriculture or his duly authorized representative.

11. No airstrip or helipad shall be constructed and no aircraft shall be landed or kept within the easement area.

SPECIAL PROVISIONS

The United States is hereby granted the right to permit the public to walk on, and fish from, a strip of land 10 feet in width along the waters edge of the Rogue River, but the public shall not be permitted to enter other areas for any purpose.

This easement and rights herein granted shall terminate in the event the easement area is eliminated from the boundaries of Rogue River component of the National Wild and Scenic Rivers System.